Good morning, and may it please the Court. My name is Celia Reumann, and I represent the appellant in this case, Christopher Heckela. The appellants will reserve five minutes for rebuttal. All right. On a rainy November 2013 afternoon in Germany, at approximately 3 p.m., military investigators arranged to have Christopher Heckela, a 19-year-old, brought to a security office on a military base where he worked so that they could question him about an alleged sexual assault of another teenager, Ms. Doe, that he knew through friends. When he got to the security office on the military base, the officer took his phone and implicitly threatened that he would use handcuffs on him and embarrass him in his workplace. As Mr. Heckela testified, he was not allowed to drive his own car and instead was transported by military investigators to a different base 10 miles away. And he was threatened with handcuffs. You mean, are you referring to the comment that we won't handcuff you? It was an implicit threat, Your Honor. What they did was they made sure he understood, though the handcuffs were not visible, they were available, and that if they used them, they would embarrass him in his workplace. And they didn't want to embarrass him. That was a threat? The threat was that they were available for use, Your Honor. I thought it was thoughtful of them not to handcuff him and tell him that we're not going to do it, trying to put him at ease. But you say it really forces in the other direction? I think it does in this case. In this case, he was then transported in the back of an unmarked police car to an unfamiliar and secure military base, and he was questioned for hours by the investigators. Counsel, do you think the police car being unmarked militates toward detention or against detention? I think the unmarked police car conceivably could go both ways, but I think it largely goes to it not implying detention in this case. When he got to the police station, he was not only questioned for over six hours. His phone was searched. With his consent? Well, the question is whether that consent was valid, because at that point they had no probable cause or even reasonable suspicion to detain him for that period of time. On his face there was consent. He verbally gave them permission to search his phone. They also took fingerprints, DNA, and photographs, and his car was ultimately searched, and over six hours later he was brought back to the other military base where he was a civilian employee, and he was released. He was told he could leave at any time? Well, he was told he was not under arrest. He was told he was not under arrest, and it's unclear exactly when that occurred. I think looking at the totality of circumstances, which is the test in this case for determining whether a reasonable person would have felt free to leave, the totality here indicates that there was custody, and that's why the district court erred in failing to suppress the statements taken in this case. Under the totality test, this court has identified a non-exhaustive list of five factors that are often relevant to determining whether custody is present, and they largely support and strongly support in most instances that Mr. Heckler was in custody. For example, the language used to summon someone is a factor this court has identified. Here the evidence is that Mr. Heckler, the agents had arranged in advance to have Mr. Heckler brought to a security office by the security manager of the base store that he worked in. As I mentioned, they made sure he understood that there were handcuffs available for use. As Mr. Heckler testified, he asked to drive his own car to the location of the interrogation, and they refused to allow him to use his own car. Moreover, they didn't really even tell him what they wanted to talk to him about. But what they did say to him at the point where they met with him in the security office was they asked him if he had a problem talking to him. And that language I think is important, because it suggests there is a problem if he doesn't talk to them. In some ways, saying he has a problem talking to them would either be a suggestion that he did something or that there could be a problem to him. And that's why I think that taken in conjunction with the other factors in the first, the other facts in the first encounter are important. The taking of the phone also I think is important in that case, because the taking of the phone really took away his ability to communicate with anyone else in the world at that moment. And given that Miranda is focused on the isolation that occurs in an interrogation, I think that fact is important for this Court to consider. The next factor that the Court has identified, I think, probably doesn't strongly suggest that there was custody here, and that's whether there was a confrontation of evidence of guilt. We don't know exactly what happened during the first three hours of interrogation, because there were no notes or recordings. Can I interrupt you? Yes. Just maybe you can cut to this. I mean, I think you know that I'm probably sympathetic to your client's argument, based on what I said in the Smith case. And I agree with you that the handcuffing remark is probably the most compelling fact in your favor. But at the end of the day, what we're trying to figure out is whether the circumstances of the interrogation were such that the person would have been likely to perhaps falsely confess. I mean, that's what we're trying to protect against, by ensuring that the person is given these warnings. And I guess I just don't see the coercive atmosphere that was created by this interview across, as I understand it, like a desk in somebody's, I like the government's term, spacious office. But whatever. You know what I'm saying? The circumstances in Smith, if we had done an over-review, I absolutely would have said that person was in custody. But the circumstances here are so much different from that. So help me see why we should be concerned that he's isolated, he's alone, he can't leave, and he would be perhaps induced to falsely confess to something that he didn't do. Well, I think it's more than, for example, the room where the interrogation took place. This Court in IMM recognized that, although not always, the fact that an interrogation takes place in a police station is often indication that there's custody present. And here the question is custody. It isn't whether the statement was involuntary. Because if there's custody found, Miranda has to have been given. And I recognize that there is pressure going on here for a lot of reasons. Here this is an unfamiliar military base 10 miles from where he worked. And he's in a secure police building. They bring him by the office where the father of Ms. Doe, the identified victim of this crime, works. So there are things going on here. I also think there's pressure applied when the police tell you you can't drive your own car. That takes away your sense that you can, in fact, leave. You don't control whether you leave. I mean, it's 3 o'clock in the afternoon on a rainy afternoon in Germany. He's 10 miles away from where he works. But tell me if this is right. I seem to recall, though, that at multiple stages of this interrogation, interview, depending on how you characterize it, he was told that if you don't want to answer any of these questions, you're free to go, right? He certainly was assured you're not under arrest. I recognize that that's, you know, they say that because they want to avoid perhaps giving the warnings. But your client was young but not so unsophisticated, I think, that he wouldn't have understood that, hey, they told me I can go if I don't want to answer these questions anymore. The reason I think the Supreme Court in Miranda identified for the need for the warnings is the inherently coercive situation of just being in a police interrogation. And so I think that's really why the custody is the key here. It is inherently coercive to be in a police station and to be questioned by police. Here they didn't. Roberts. But wait, wait. But that is not true because the Supreme Court has told us that's not true, right? You can't just have that and say therefore you're in custody, therefore you're entitled to Miranda. Maybe that would be better, right? Because I agree with you. Being alone in a police environment, it's inherently coercive. But the Supreme Court has told us otherwise. So you've got to have something else. And I guess I'm – I saw there's something else in Smith, but I'm just not seeing it here. Well, here it's all of the factors that come together. Perhaps individually, and I think what the government did in response was take each one seriatim and kind of make it a – each one and say this isn't coercive by itself. But if you look at the whole picture here, this isn't unsophisticated. This is a layperson that we're dealing with. This is not, I think as the probation report confirmed, Mr. Heckel had no prior law experience. So while he's 19 years old, he's never been in this situation before. And I know that this is not – this is a reasonable person test. It's not an individualized person test. But I think the pressure that's being applied each step of the way, they take away his choice and have his security manager escort him to the security office. They take away his choice to drive his own car. They take away his choice to communicate. They take his phone. They put him in the backseat of a police car. And while it's not marked, sitting in the back of a police car with – I think there was a police officer in the backseat with him and one driving. That is a confined space. And this isn't the situation we've got the glaring lights or we've got some extreme interrogation methods going on. But we have a situation here where collectively this information adds up to a custody situation. And when custody is present, Miranda is required. Here custody was present based on the totality of circumstances. And I think it's made clear by the statement of the agents when they release the defendant in this case. They say they're going to release him on his own recognizance. That, while the intent of the agent isn't relevant or isn't determinative, it certainly is a factor under the totality that informs what the environment they were trying to create for these young men. And they took photographs, fingerprints, and DNA evidence before they released them on their own recognizance, which really are the hallmarks of things that occur after someone has been arrested. Can you remind me how incriminating were your client's statements during this interview slash interrogation? They were extreme. They were incriminating in that before the accession there was no Ms. Doe does not recall anything that happened with Mr. Hecola. So any evidence of Mr. Hecola's sexual touching of Ms. Doe came from Mr. Hecola during this interview. So in this case, the government has not argued harmlessness and, therefore, has waived harmlessness. And so we would ask the Court to reverse on that basis. I would also note that these factors also go to whether there's a Fourth Amendment seizure in this case. And excuse me, ma'am, just grab me. Whether there's a Fourth Amendment seizure. Roberts, would you concede that if we were to rule against you on the custody for Fifth Amendment Miranda purposes, that your argument on the search of the phone falls away? I don't think so, because the standard is different. The facts are the same, but the standard is different. And the standard is whether there was a show of force by police. And these same factors are shows of force by the police, and, therefore, the Fourth Amendment is implicated. The government concedes there's no probable cause and there's no reasonable suspicion in this case to seize these young men, Mr. Hecola specifically. I don't think, turning to the Fourth Amendment, I didn't find any place where you had raised this the district court. I was not the trial lawyer, but I will. But it's not in the trial court's papers. It was never brought to the attention of Judge Campbell. While the Fourth Amendment was not cited specifically. Not cited, was not mentioned, was not considered, was not argued, was not mentioned to the district judge. Why isn't it waived? Well, the district court ruled that there was a consensual search. So the district court understood that there was a Fourth Amendment issue that was being considered. I will grant the court that the language in the motion is not the picture of clarity. It's not a question of clarity. It was never raised. It was never mentioned. And so the district court was not ruling on the Fourth Amendment. The district court was ruling on what it had before based upon the papers that your client presented. So I don't see how we get to the Fourth Amendment. I think the district court expressly ruled on the – he didn't – the district court expressly ruled that there was consent to search the phone, which is a Fourth Amendment consideration. So the district court understood the Fourth Amendment was – Where in the record can you show us where the district judge mentioned the Fourth Amendment at all? The district court judge, I don't think, mentioned the Fourth Amendment, but he ruled – But you say it was raised even though it was never mentioned, it was never a request for it, and then all of a sudden we're going to reverse the district court for an issue that was never officially raised. I think the only way the district court could have ruled that there was no consent, that only comes into play if there was a Fourth Amendment question before the court. You know, some of us have been district court judges, and the lawyers community do a lot of talking. We try our best to answer all the questions. And I don't see how you're going to get around waiver on this one. Even under a plain error standard, I think that Mr. Heckelish should prevail on that issue. But my time is up, and I'd like to reserve time for rebuttal. Thank you. All right. Thank you, counsel. It's not your fault, I understand. You have what you have. Good morning, Your Honors. My name is John Stickles, and I'm here representing Mr. Joseph Martin. And I would like to talk very briefly about the jury instruction error in this case. You never raised this issue, and your client never raised this issue, so it's not the one we've been talking about. Oh, it did, Your Honor. But I think the prior attorney adequately argued both of those. When I say you, I'm talking about the lawyer. It was not raised before the district judge. No, sir. The jury instruction error was not raised. Therefore, we're here on plain error. Okay. Your Honor, very briefly, we believe the jury instruction was erroneous and constituted plain error because the jury instruction allowed the way it was charged with Count 1, 2, and 3 allowed the jury to find Mr. Martin guilty based upon an erroneous theory of the law. And that is because Count 1, they were charged in conspiracy. Count 2, Mr. Martin was charged with being a member of the conspiracy and committing sexual abuse. And Count 3, he was charged with being a member of the conspiracy and committing aggravated sexual conduct. But, counsel, they were not convicted of conspiracy, so where was the error? The error comes in because they were not convicted of conspiracy. Count 2 and Count 3 failed to inform the jury that they had to be convicted of conspiracy before they could be convicted based upon the acts of a co-defendant. They were they could be convicted based on merely being charged in the conspiracy and not convicted. The jury instruction should have. But that was only one thing. Was that the only theory of conviction? There were three alternative. And that is the other problem. There were three alternative theories of conviction. But based upon the way the jury verdict, I mean, the jury instruction read, we can't tell which theory the jury convicted them of. Well, isn't it fairly obvious that it's not the conspiracy theory if they were acquitted of conspiracy? Your Honor, it may or may not be fairly obvious, but we don't know. That's not a fair inference? It may be a fair inference, but we don't know what grounds they were convicted on, and we can't tell from the instruction what ground they were convicted on. The other problem with the jury instruction is that throughout the instruction, it repeatedly referred to as defendants, and there was no individualized finding of guilt. There was one small statement that each jury had to find that each defendant was guilty, but that did not mitigate against the multiple times that defendants were referred to collectively. I slipped by that one a little too fast. The judge gave the Ninth Circuit jury instruction, preferred jury instruction in situations like this that you have to consider each person separately. So whatever happened on the Pinkerton charge, you still had to find that your client was separate and involved. It seemed to me that that was the reason why Judge Campbell gave that instruction. You didn't object to that instruction, your client. My client did not object to the instruction in the Supreme Court. So why isn't that sufficient so that the jury is properly instructed that regardless of what happened on the Pinkerton claim, they still have to find that the individual on its own would be guilty? Usually we think that's what that reason, the reason for that jury instruction. Why in this case doesn't that approved jury instruction solve the problem? Because of the many, many times during the jury instruction that they referred to, they referred to as defendants in the plural. Yes. That one statement that you have to find each defendant acted, that's just not enough to mitigate against the multiple times they were referred to as defendants. Well, isn't that's what I'm saying. Doesn't that, even though they say defendants must do this and that, the judge then identifies that you have to find each facts, convicting each one of the people separately. And that's the purpose of that instruction as I understand it. Why wasn't that sufficient here? It's not sufficient because of the multiple times during the instruction they were referred to as defendants and that one little statement does not mitigate against that multiple times they were referred to as defendants. So whatever the jury judge does to try and correct any error that may take place would not be sufficient as far as you're concerned? Without referring to each person individually throughout the jury instruction, I do not believe that would be sufficient, Your Honor. Did you all want to save any time for rebuttal? Yes, ma'am. I'm going to stop. All right. Thank you. Let me ask you one other question. Your client never brought up this idea, was not involved with what we were discussing with your co-counsel. I don't understand the question. As far as the person being in detention and the rest of that. Yes, sir. It was brought up also. I just chose not to argue that here today. I thought you'd waive that, your client had waived that. No, sir. It's in your brief, right? Yes, it's in the brief. It's in the brief, but I'm talking about at the trial court level. Did you file a motion to suppress at the trial court level on the basis of involuntary statements under Miranda? Yes, Your Honor. I didn't find that. So if you could look during your place and show me, that would be great.  Thank you. We'll hear from the government. May it please the Court, James Pierce of the United States. The district court correctly denied the defendant's suppression motion and the jury instructions and verdict form were not plainly erroneous. Let's hear your response on the handcuffing thing, because as I recall, the district court, for whatever reason, didn't make a finding one way or the other as to whether that statement was made. Is that right? That's correct. And I guess I'm struggling with how can we affirm without knowing whether that statement was made, because you're going to assume, defend it on the ground that, well, even assuming the statement was made. But the implicit threat, it seems to me, that is carried with that is that you are coming with us one way or the other. We can either do this the hard way or the easy way. It's up to you. And if that's, in fact, the threat that was conveyed, I don't see how we can say he wasn't in custody at that point, because no reasonable person would feel free to decline the encounter if they thought they were going to be dragged out in handcuffs if they didn't go under their own volition. So a number of responses. You are correct that we argue and do argue that even assuming it was made, it was not coercive. But I also want to back up for a minute and just talk about the way to review this as a factual matter. You're also correct the district court didn't make factual findings on this point. In footnote 3 of Kim, this Court has described that in that scenario where a district court denies a suppression motion and doesn't make factual findings, this Court is to uphold it if a reasonable view of the evidence supports the denial. So we think a reasonable view of the evidence, even if the evidence supports the denial. Roberts. This is a straight credibility determination, right? Well, actually, I take that back. I do recall that Mr. Heckela. I believe it's Heckela, yes. We've been struggling with that all week. He did say explicitly that this agent made that statement to me, right? That's correct. Was the agent asked point blank, did you make that statement? He was, I believe, and said he did not. Okay. So, yes, it is a pure credibility determination. There is no finding on it. My point is large, is a different one and perhaps links back to even if made, we think we prevail, which is that under a reasonable view of the evidence here, without even making a credibility determination, there are facts to do it. You're trying to say that we're giving these two people, the only two people basically who are there, say directly conflicting things and we're supposed to say under a reasonable view of the evidence one is telling the truth and the other is not? No. This Court is not. I'm not asking this Court to make a credibility determination here on appeal. That's a district court job. Right. So fine. Let's just assume. My point is, again, there is enough evidence even assuming that comment. Now, one response to that is the comment that Judge — is the way to view it that Judge Wallace did, which is that it is a way to say we've got these handcuffs, we're not going to use them, and it's a way to put the defendant at ease. I don't want to press that point. I'm saying that is a way to view the evidence here. Okay. Let's say I don't view it that way. I think that's fair enough. Take it as conveying the implicit threat that I just articulated a second ago.  So — and also just to situate where we are here. This is — in my view, this is relevant to the first of the five-factor tests. Globally, as Your Honor pointed out, we have the bottom line that the officer said you're not under arrest, you don't have to talk to us. I think that's decisive. But back to your specific question. This is — this deals with what is the language or behavior that is used to summon the defendant, or in this case the defendant, at that point the suspect, to an interview. The handcuffs point, I think, is something that would certainly shade this towards the coercive and would tend to show custody. There are other factors and facts here that push against it on that first factor. He was in a business suit. He was doing it in a way where he used the kind of language telling him you're not under arrest, you don't have to talk to me. As we've already talked about, there was an unmarked police car. I don't think it was discussed before. He didn't begin with any kind of substantive questioning on the way over to the police  So I think that the handcuffs point makes that first factor closer. And I agree that the way to read it is probably not as complementary, even reading it in the way that you've suggested, Judge Watford. But that makes the first factor closer. If you look at the rest of the factors, I think that those strongly support, and I'll carve out time because I think that's a closer call, but the fact — a noncustodial finding. The idea of being confronted with evidence of guilt, there was — the investigators here, and relevantly Corte, didn't know what had transpired at that point. And this is very different from the kind of case where investigators know a crime has been committed and they're looking for who did it. Here they're just trying to figure out what happened on the nights of October 19th and 20th. So I think that factor, the district court correctly found, favors a noncustody. The third one is the surroundings in which everything takes place. Perhaps it is spacious as far as the government is concerned, but the bottom line point is the office in which it happened was one where this is not a cramped room. No handcuffs are being used. They're sitting across from each other in a desk. Mr. Hecola says at the end, the investigator was pleasant to me and says it was pleasant. There were breaks taken. I think all of those things also favor noncustody. The fourth one is time. This is a long interview. I don't think it's 6 hours, maybe 6 hours from beginning to end, but 4 hours of questioning. And that's long. And there's no way to run away from that fact. But hearkening back to what the Miranda decision talks about with time, I think the concern is when law enforcement uses time as a strategy to transform resistance into compliance. You put someone in a room. Take the Miranda decision itself. In that case, Escobedo, I think it was, comes in saying, I didn't do it. You did it. I don't want to talk to you. And time is there a way to get this guy, to break him down. And the facts here just could not be more different. Here, when you're at the base exchange, Mr. Hakula knows he doesn't have to talk, but willingly agrees to come with the officer. When you're back at the police headquarters, the CID headquarters, he again is informed, you don't have to talk to me. You're not under arrest. And yet he continues to talk. And in fact, in some ways, and I don't want to press this point too hard, but in some ways, the extent of time shows the thoroughness with which the interview took place. And Mr. Hakula's attorney doesn't make the point today, but there was some discussion about it not being recorded. We actually have Mr. Hakula's own words, which he had the opportunity to type and to review. That's, again, I think it's probably fair, as the district court said, to say it's a neutral factor. But the point is, at bottom, time was not used here in a way to break down a non-cooperative  case. Mr. Hakula was willing to talk about this. His statement at times is boastful about his encounter with the victim. So I just don't think time pushes strongly towards custodial finding. And then finally, the last of the fifth factors that this Court looks at are whether there was pressure applied in the interview itself. And again, there's nothing in the record to suggest that either. The exchange was a pleasant one as far as even Mr. Hakula represents. Roberts. So I guess you would like to isolate the handcuffing statement just to the first of the five factors, and you've done a nice job of cataloging the other ones. But I guess it strikes me as you would certainly agree with this, wouldn't you? Let's say that the summoning of Mr. Hakula from his workstation or wherever he was up to meet the agent, that he actually was put in handcuffs and taken to meet the agent, and then the handcuffs were removed and the agent said, listen, you're not under arrest, but we've got some questions. We'd like to ask you to come to this base. No, you can't drive your own car. I assume in that scenario you would say that the person likely wouldn't feel free to leave, notwithstanding the assurances that they were not under arrest. Wouldn't you agree with that? I think that's a lot harder case. I mean, I think you could say that the use of handcuffs, I think, always transcends and courts have been clear. That looks a lot more like custody than anything else. And that can basically override all of the other, even if you go through all of the other four. If that one creates such a coercive atmosphere from the get-go, the agent can give all of the assurances about you're not under arrest, you're free to not answer my questions. A reasonable person, especially someone who's 19 years old, hasn't had any prior law enforcement contacts, you would agree that that could be so powerful in terms of its coercive effect that it would just essentially trump the other factors. I can imagine that hypothetical scenario. I'm not sure I would be readily agreeing to the fact that anything in this Court's decisions has something where something like this would be so powerful that it would overpower or trump any of the other factors of the inquiry. Your Honor likely expects this response. But that's certainly not what happened here. There's nothing in the record to suggest that he was handcuffed. I grant you that. But the threat to use handcuffs, that's why I guess I'm saying, I just don't understand how we can affirm, if we don't know the answer to the question, whether that statement was made, because if there were a threat to use handcuffs, if the person decided not to comply with the, quote-unquote, request to accompany the officer, I don't see how that's any different from having put the person in handcuffs and dragged them out. Well, I do think it's different, because the use of handcuffs itself is something that is, pushes much more closely to the custody type of inquiry, whether it's early on or in the station house itself, as is in Miranda itself. Counsel, let me ask you this question. Are you aware of a case where handcuffs were used, but nevertheless there was a finding of a lack of custody? I am not aware of a case that does that. And that's why I think that Judge Watford is probably right, that if you use the handcuffs – now, your hypothetical is a curious one, because you use them and then you take them off, and I don't know the answer to once, if there's custody, can it be undone by statements. I don't think law enforcement can utter the magic words, you're not under arrest, you're free to go, and then that just ends the inquiry. I think that the other factors about the setting and whatnot are relevant as well. But here, those all push towards a – a showing of non-custody and not trying to extract a confession, but in fact an interview that Mr. Heckela was – was willing and cooperative to participate in. Okay. Remind me of the sequence, because I might have it a little bit off. Mr. Heckela is – where is he? He's working in a store? He's working at the Base Exchange, which is like a large department store, as I understand it, or a large kind of mall on the – on the airbase. Okay. He works in the power zone there. And where is that in relation to where he eventually makes first contact with the agent? So there is a security office on the – on this Base Exchange. As I understand the record, Mr. Heckela, a security manager employed by the Base Exchange comes to him, says something to him, there's someone waiting to talk to you. That's not – we don't have any testimony from the security manager. Okay. Heckela doesn't address that. Heckela comes to the – to the Base Exchange security office, and there the officer is waiting for him. There's some dispute as to how many, whether it's two or three. And at that point, according to the officer, he says – who is wearing, like, a business suit, and he has handcuffs and a gun, but they are concealed. And he says, I'm so-and-so from the CID. I'd like to speak with you. You are not under arrest. You don't have to talk to me. Then there's dispute about whether he set his point on the handcuffs. Roberts' statement, if it were made, was to suggest that we want you to accompany us from the security office out to the parking lot so we can get in the car, and if you don't – That is my understanding of the record, yes. Okay. And so the – at least from Mr. Heckela's testimony, the threat was if you don't agree to basically just follow along with us, we can put you in handcuffs and basically force you to come with us. That's – I think that is – that is their view of the record. I would say, just again to clarify, a factual point, the officer – Mr. Heckela didn't actually testify that I wasn't told I could take my car. He was asked when he was testifying, would you have preferred to take your car out to the station? Yes, I would have. But he didn't say, the officer said to me, you can't take your car. The officer said, I don't remember whether I gave him a choice one way or the other. So I'm just – again, factual points that I think in this one shades it closer towards the non-custody finding. I just want to make sure I got – I understand what you're saying. I thought he said I asked, can I drive my own car out there, and he was told, no, you cannot. I believe that's not – that's not an accurate characterization. Okay. What's the accurate characterization? That he was asked, would you – would you sitting here today have preferred back then to have taken your car? Yes, I would have. And the officer said, I don't recall addressing this issue one way or the other. Minor point, but just so we're clear on the record. I don't want too much time to lapse without speaking to the other issues. Of course, I'm happy to address further custody questions. But as to the Fourth Amendment, there are two quick points. One, as Judge Wallace indicated, we – and we put out in our – point out in our brief, we believe it's waived or at best under plain error review. And then to speak to Judge Watford's question, we also believe if the court is – were to side with us on the custody finding, that would essentially eliminate the Fourth Amendment question as well. Turning to the jury instructions briefly, it's our view that the Pinkerton instruction was correct. And we're on plain error review here. And this Court would – would ultimately have to hold that the use of this Court's model instructions was a – an obvious error. We don't think it was error at all, but I don't think it was – it was obvious, even if it were. And then I think along the lines Judge Rollinson spoke to, there was ample evidence – it didn't affect the substantial rights. It would have been a harmless error. The – the evidence that had – that came in was more than sufficient to satisfy overwhelmingly that they had committed the two offenses for which they were convicted, not the conspiracy offense. What about the grouping of the defendants together collectively in the instructions? Well, this Court has long held that juries are presumed to follow their instructions. And as I think Judge Wallace pointed out, the district court gave the instruction to the jury that you – you jury members are to assess each defendant's guilt separately without regard to any other verdict that you render. And now using – charging the defendants collectively, I mean, perhaps it would be better to say each defendant, but that instruction that – that channels the consideration to each separate defendant is also, in our view, not erroneous. But does that negate the fact that in more times than the district court said to view each defendant separately, many more times viewed them together? So why wouldn't that negate the one instruction if the – if the court grouped them together so many times? Well, I think that it's – it's what the grouping together did versus the instruction for separate consideration. The grouping together were just listing the elements. They weren't saying the – they weren't implying that by acting together you should just lump them together as one. They were fairly informational in what they were doing. You wouldn't have had any change in meaning if you said to find defendants – to find each defendant guilty, you must find X, Y, and Z. I think that's a big difference. Well, I guess I would disagree with Your Honor. I've charged a few juries, have given jury instructions, and I – there's a difference between saying to find defendant X guilty, to define defendant Y guilty, and saying to define the defendants guilty. It's kind of in the – to me, it gives the – them a collective image in the jury's mind. It seems to me that in a case where defendants were charged with separate crimes and – or there were sort of some concern about, you know, you had a group of defendants and one was obviously less culpable and one was obviously more culpable on the facts, then there might be a closer question. But here on plain error review, it seems quite a large ask for the defendants to say that notwithstanding clear precedent that a jury follows its instructions and the jury here was told to consider them separately, that a shorthand of using defendants instead of each defendant was sufficient to – An easier question for you, if the evidence was identical against them. But the evidence was not identical against the defendants in this case. Well, it's true it wasn't identical, but it was very similar. I mean, both defendants were involved in the sexual assault on the victim. Both defendants gave statements that described their own specific roles in it. Those roles differed. I don't need to go into details. I assume the Court is familiar with the record here, but both of them were very closely involved with the sexual assault of the victim. I mean, we'll go into that. But the jury may have considered one more culpable than the other based on the facts. That's why I think it was dangerous to link them as a unit. It, to me, tempted the jury to consider the evidence globally against both of them. Well, and in fairness, I mean, there was also a conspiracy charge that did charge them with acting together, and they were also aiding and abetting charges. So the jury was, through the charges and based on the indictment, considering their joint activity here. So that's, again, I think another factor that would point out saying, in fact, it was appropriate for the jury on the one hand to consider how their cooperative action could result in criminal liability towards both of them. And on those particular charges, on the aiding and abetting charge and on the conspiracy charge. But there were three counts. Both of them charge the conspiracy doesn't charge aiding and abetting. The conspiracy count, counts 2 and 3, both charged both defendants and both used aiding and abetting. So my point is it was joint action throughout and it was charged that way. How did the district, how did the defendant raise the issue with the district judge in using the plural defendants? The defendant did not at all. That's why we're here on plain error review. We're here on a plain error rule. I just wondered, did the district court judge give this, treat each one separately, the approved jury instruction in the Ninth Circuit, on his own or was it in response to, was not in response to an objection? He just gave that instruction. I believe that's correct. I believe that was part of, I don't know whether it was part of the government's proposed initial instructions or part of what the court provided, but it was not inserted at the behest of any party. That was, as I understand it, part of the proposed instructions. So it's plain error review. That's correct. Was that part of the initial instruction or the instructions that go, that are given immediately before deliberation? Do you know? You're saying the initial is in the beginning of trial? Right, right. I don't believe the judge addressed the issue at the beginning of trial, so this was part of the final closing jury instructions that the court gave. I see I'm almost out of time. I'm happy to answer any other further questions, including on the Stored Communications Act. Otherwise, I'd rest on what we've put in our brief. I have one irrelevant question, but I'm curious because I never did bother to figure out. So why was this case tried in Arizona? What was the connection? So we're under the MEJA, the military, I can't even remember the E, but basically what allows for the trial of military members and one of the defendants. Extradition maybe? I don't think it is extradition. It doesn't matter. But I'm embarrassed to say I forgot. Are they from Arizona? I believe one of the defendants was from Arizona, but that's. There's some Arizona connection to this. That's correct, that's correct. And in fact, the initial search warrant was for the District of Columbia because the trial team wasn't sure about the appropriate place to try it. I would assume this case would be tried. Right, and D.C. is sort of the default under the MEJA for where to try these cases, but then because of one of the defendants' association with Arizona, that's why it was subsequently prosecuted there. Got it, okay. Thank you, counsel. Thank you very much. Roboto? Just a few points. At ER 221 was where the defense prayed for the suppression of his phone as the product of, as he put it, an involuntary capitulation and the district court made an express finding that there was consent on the phone. This interrogation, the time at the police station is, if there's a half hour each way from the location, they're at the police station for over five hours. Time is an important factor, I think, in contrast to what the government argued, in encouraging people to make statements and therefore, it adds to the coercive nature of it. The Barnes case, while the handcuffs, I think, are important, they're not dispositive. And I think the Barnes case, this court found custody even in the absence of the use of handcuffs or arrest. And so, while it is important, I think all of the other factors taken together address the issue. In this case, at ER 435, the agent was asked, excuse me, Mr. Hecola was asked, stated that, I asked if I was able to follow him in my own vehicle that I owned and I drove and I was told I was not allowed to. So he expressly made that statement. On the jury instructions, I would just note that 16 times this jury was told to consider the defendants collectively as the defendants. But what's your response to opposing counsel's observation that because there were conspiracy charges and aiding and abetting charges on all of the counts, that any error would be harmless? I think that highlights the problem with the other jury instruction issue that we raised, which is that they were acquitted on the conspiracy charge, but the jury was instructed that they could be found guilty of the substantive offenses on a conspiratorial liability theory. And therefore, that raises the problem there. If the answer is, well, they're being considered collectively, the jury needed to be made aware that if they acquitted on the conspiracy charge as they did, they could not rely on conspiratorial liability to find them guilty on the substantive offenses, and the jury was never told that. So I think that highlights the problem and the connection between those two issues. Are you going to answer the aiding and abetting connection? I think the answer is, I think because there was these collections of theories of liability, the Court needed to do a better job at least to have a specific jury instruction so that it articulated to the jurors the order they needed to find things. Well, I suppose the judge might have had defense counsel objected. But here, there was no objection, but the judge gave the instruction that he probably would have given had the objection been made, the one that's approved in the Ninth Circuit of treating each one separately. How does that become plain air? I think because the law is plain on this issue. The district court, I think the district court, Judge Campbell, I have nothing but respect for Judge Campbell, and I'm sure that if he had the chance, he might have considered it differently. And that's why plain air applies in this case. The law is clear on what's necessary. And I think the connection between these jury instructions highlights that there was plain air with regard to the jury instructions. Because of that law. In spite of the giving the instruction that we have approved to cure that, any error? I think the overwhelmingness of the joint liability discussion, referring to the defendants and not saying consider each defendant on this, each defendant on this, I think the overwhelming message to the jury was that they were a uniform consideration. Unless the Court has additional questions, we would ask this Court to reverse Mr. Heckel's convictions. All right. Thank you, counsel. Thank you to all counsel for your arguments in this case. Excuse me. The counsel was going to give me some information. Do you have the information for Judge Walton? Come up to the altar. The altar. Pray while you're there. Martin filed a motion to suppress his statement, but did not file a motion to suppress based on the Fourth Amendment of his search of his phone. Well, I'm considering whether or not it's waived. The issue is waived because you didn't raise it in the – if this is your brief, it was not raised in the statement of issues presented for review. And you did have it in the summary, but it looks like it was very similar and followed your co-counsel. But we said in Marano, in Martinez-Marano, that not discussing it in the body of the opening brief waives the issue. And so I was just raising the issue and let you have a chance to respond. It looks like to me that you may have waived the issue. I understand the Court's argument. However, I believe it was adequately briefed. All right. Thank you, counsel. Just for the record, the E is extraterritorial jurisdiction. All right. The case just argued is submitted for a decision by the Court. The next case on calendar, Mineworkers Pension Scheme v. First Solar, has been submitted on the brief. The next case on calendar for argument is Tyndall v. First Solar, Inc.
judges: Wallace, Rawlinson, Watford